# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 16, 2020                    Decided July 30, 2021

No. 20-1032

ALASKA COMMUNICATIONS SYSTEMS HOLDINGS, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 20-1069

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Daniel A. Adlong* argued the cause for petitioner. On the briefs were *Matthew J. Kelley* and *Kenneth B. Siepman*. *Christopher C. Murray* entered an appearance.

*Brady Francisco-FitzMaurice*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Ruth E. Burdick*, Acting Deputy Associate General Counsel, *David S. Habenstreit*, Assistant General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: Alaska Communications Systems Holdings, Inc. provides telecommunications services throughout Alaska and in Oregon. While most of the company's employees are based in Alaska, some are in Oregon. Before the proceedings in this case, the union that represents a majority of the company's employees did not represent any of the Oregon-based employees. The union then sought to hold a representation election among a subset of the Oregon-based employees. The National Labor Relations Board certified a voting group that differed slightly from the petitioned-for unit, and that group voted to join the preexisting bargaining unit.

The company now challenges the Board's certification of the voting group. We conclude that the Board permissibly adjusted the composition of the voting group and permissibly determined that the group shares a community of interest with the preexisting bargaining unit it voted to join. We thus reject the company's challenges.

I.

A.

Section 7 of the National Labor Relations Act guarantees employees the right to "bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Under Section 9, representatives "selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes[] shall be the exclusive

3

representatives of all the employees in such unit." *Id.* § 159(a). The Act tasks the Board with deciding "in each case . . . the unit appropriate for the purposes of collective bargaining." *Id.* § 159(b).

The Act also sets out the procedures the Board uses to determine an appropriate bargaining unit. After a labor union files a petition for a representation election, if the Board determines that the petitioned-for unit is appropriate, the Board orders an election in which employees in the unit vote on whether to select union representation. *See id.* § 159(c). If the Board, though, determines that the petitioned-for unit is inappropriate, "the Board may examine the alternative units suggested by the parties, but it also has the discretion to select an appropriate unit that is different from the alternative proposals of the parties." *Bartlett Collins Co.*, 334 NLRB 484, 484 (2001).

This case involves a "self-determination" election, in which a union petitions to "add residual employees to an already existing unit rather than to create a new unit." *Rush Univ. Med. Ctr. v. NLRB*, 833 F.3d 202, 205 (D.C. Cir. 2016). In such an election, employees unrepresented by a union vote on whether to join a preexisting unit of represented employees. The Board's approval of a self-determination election is contingent on, among other things, a determination that the voting group and the preexisting unit share a "community of interest." *See id.*

B.

Alaska Communications Systems Holdings, Inc. (the Company) provides a range of telecommunications services, including landline telephone, internet service, fiber optic data transport, and more. The Company is principally based in

Alaska but also has an office and employees in Oregon. Before the proceedings in this case, approximately 320 of the Company's 580 employees were represented by the International Brotherhood of Electrical Workers, Local 1547 (the Union) in a bargaining unit known as the Alaska Unit. Until these proceedings, none of the Company's Oregon-based employees belonged to a union.

In Alaska, the Company provides local exchange carrier services, commercial and residential internet service, and data transport services. The Alaska-based group responsible for remote network monitoring is called the Integrated Network Management Center. The Center remotely monitors the Company's vast network in Alaska, as well as certain equipment located in Oregon and Washington. The Alaska group responsible for physically tending to the Company's cables throughout Alaska is called the Network Engineering group.

The Company's Oregon branch is headquartered in Hillsboro, near Portland. The organization of the Oregon-based operations resembles that of the Alaska-based operations. The Cable Systems Group consists of two sub-groups: the Network Operations Center remotely monitors the telecommunications networks, and the Cable Operations department physically maintains the Company's cables.

The Network Operations Center includes only Oregon-based employees. They remotely monitor the Company's network in Oregon, its cables running across the Pacific Ocean between Alaska and Oregon, and a line in northern Alaska. The Cable Operations department, meanwhile, has five employees in Oregon and two in Alaska. That department tends to the Company cables' landing stations in Oregon and Alaska. The Alaska landing stations are serviced by Jacob Kelley and

Stephen Huff, the two employees stationed in Alaska. They work on equipment throughout Alaska, including servicing the line in northern Alaska. Prior to these proceedings, Kelley and Huff did not belong to the Union.

The Company's Alaska and Oregon operations are overseen by common management. The Company's Vice President supervises Thomas Brewer and Greg Tooke. Brewer, whose primary office is in Anchorage, oversees the network monitoring groups in both Anchorage and Hillsboro. And Tooke, who is also primarily stationed in Anchorage, oversees the cable operations groups, which consist of the Alaska-based Network Engineering group and the Oregon-based Cable Operations department.

Under Brewer, Network Operations consists of seven employees, including Jeffrey Holmes and six employees who report to Holmes. Under Tooke, Cable Operations consists of seven employees, including Anatoliy Pavlenko and six employees who report to him. That group of six employees is made up of four Oregon-based employees, as well as Kelley and Huff, the two Anchorage-based technicians. Both Brewer and Tooke spend some time working in Oregon.

C.

In 2018, the Union filed a petition seeking a representation election among a group of the Company's Oregon-based employees. The petitioned-for unit encompassed twelve Cable Systems Group employees, including both Holmes and Pavlenko. The lone Cable Systems Group employees excluded from the unit were the Alaska-based Kelley and Huff.

The Company opposed the petition on two grounds. First, the Company contended that Holmes and Pavlenko were

supervisors and thus were ineligible employees under the Act. *See* 29 U.S.C. § 152(11). Second, the Company argued that the petitioned-for unit did not share a community of interest with the existing Alaska Unit.

Following hearings spanning multiple days, the Regional Director issued a Decision and Direction of Election. The Regional Director credited the Company's first objection and excluded Holmes and Pavlenko from the voting group because they were supervisors. The Regional Director further found that excluding Kelley and Huff—the sole Cable Systems Group employees not included in the unit—"would unduly fragment the workforce and render the proposed Voting Group an irrational and indistinct one." Reg'l Dir.'s Decision & Direction of Election at 23, J.A. 427. The Regional Director explained that the record adduced at the hearing "includes ample evidence" to justify the inclusion of those two Alaska-based employees in the voting group. *Id.* at 23 n.30. The Regional Director then applied the Board's community-of-interest standard and concluded that the voting group—consisting of the petitioned-for unit, but with Kelley and Huff replacing Holmes and Pavlenko—was an appropriate unit.

The Board denied the Company's request for review. Although the Board modified certain of the Regional Director's findings, the Board agreed with the Regional Director's ultimate conclusion that the selected unit shared a community of interest with the Alaska Unit.

The approved voting group held a self-determination election and voted to join the Alaska Unit. The Regional Director then certified the Union as the exclusive collective-bargaining representative of the voting group.

To enable judicial review of the Board's certification decision, *see, e.g.*, *Ozark Auto. Distribs., Inc. v. NLRB*, 779 F.3d 576, 579–80 (D.C. Cir. 2015), the Company refused to bargain with the Union over the Cable System Group's terms of employment. The Board's General Counsel issued an unfair-labor-practice complaint and later moved for summary judgment, which the Board granted. The Company filed a timely petition for review in our court, and the Board filed a cross-application for enforcement of its order.

## II.

"[W]e will uphold the Board's decision if its ruling is not arbitrary, capricious, or founded on an erroneous application of the law, and if its factual findings are supported by substantial evidence." *Advanced Life Sys. Inc. v. NLRB*, 898 F.3d 38, 43 (D.C. Cir. 2018). We "accord the Board an especially wide degree of discretion on questions of representation." *Rush Univ. Med. Ctr.*, 833 F.3d at 206 (internal quotation marks omitted). The Board's "broad" discretion "in this area . . . reflect[s] Congress' recognition of the need for flexibility in shaping the bargaining unit to the particular case." *Dodge of Naperville, Inc. v. NLRB*, 796 F.3d 31, 38 (D.C. Cir. 2015) (quoting *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 236 (D.C. Cir. 1996)). When reviewing the Board's findings of fact under the substantial evidence standard, we reverse "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015) (quoting *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011)).

Before turning to the merits of the company's challenges, we note that a pending lawsuit in the Court of Appeals for the Ninth Circuit involving the same factual background poses no obstacle to our deciding this case. *See Int'l Brotherhood of*

*Elec. Workers, Local 1547 v. Alaska Commc'ns Sys. Holdings, Inc.*, 424 F. Supp. 3d 598 (D. Alaska 2019), *appeal docketed*, No. 20-35021 (9th Cir. Jan. 14, 2020). That litigation, filed directly by the Union, stems from an effort to arbitrate the dispute between the Union and the Company under the terms of the parties' collective bargaining agreement. *See* 424 F. Supp. 3d at 602. The Board—which is seeking to enforce its order against the Company here—is not a party to that separate litigation. And the Company, the only common party between the two lawsuits, does not object to our deciding this appeal. *See* Oral Argument at 12:30–19:00.

## A.

The Company first argues that the Board acted unlawfully in various ways when it modified the petitioned-for unit to include Kelley and Huff, the two Alaska-based employees in the Cable Systems Group. We find no merit in the Company's arguments.

## 1.

Section 102.66(d) of the Board's regulations precludes parties from "raising any issue, presenting any evidence relating to any issue, cross-examining any witness concerning any issue, and presenting argument concerning any issue that the party failed to raise in its timely Statement of Position or to place in dispute in response to another party's Statement of Position." 29 C.F.R. § 102.66(d) (2017). The Company argues that the Union violated that rule by belatedly attempting to include Kelley and Huff in the voting group.

The Company's argument stems from a mistaken premise: the Company itself, rather than the Union, introduced the notion that excluding Kelley and Huff from the voting group

would be improper. The Union initially sought to incorporate only the Oregon-based Cable Systems Group employees into the existing Alaska Unit. The Company responded by challenging whether a sufficient community of interest existed between those employees and the existing unit. Then, at the hearing, the Company repeatedly elicited testimony suggesting that the petitioned-for unit would be inappropriate without Kelley and Huff's inclusion. The Hearing Officer then asked the Union if it wished to proceed to an election with an alternative unit if the petitioned-for unit was found inappropriate by the Regional Director or the Board. In response, the Union deferred to the Board's authority to select an appropriate unit. The Union thus did not raise the issue of Kelley and Huff's inclusion, and the rule cited by the Company has no bearing on the Board's decision to add the two employees.

The Company next attempts to reframe its procedural challenge by arguing that the Board violated its rules by recognizing an alternate unit not proposed by either party and without affirmatively soliciting evidence on that unit. Nothing in the Board's rules, however, constrains its authority to identify an appropriate unit not presented by the parties. To the contrary, while Section 102.66(d) precludes a party from raising arguments not made in its Statement of Position, another subsection expressly preserves "the regional director's discretion to direct the receipt of evidence concerning any issue, such as the appropriateness of the proposed unit, as to which the regional director determines that record evidence is necessary." *Id.* § 102.66(b) (2017).

That rule "ensures that the Board will have sufficient evidence in the record to make an appropriate unit determination," as "it is the Board's responsibility under Section 9(b) of the Act to make appropriate unit

determinations." Representation—Case Procedures, 79 Fed. Reg. 74,308, 74,365 (Dec. 15, 2014). Accordingly, the Company errs insofar as it suggests that the Board's recognition of a bargaining unit not proposed by the parties exceeds the Board's authority under the statute: the Act calls for the Board, not the parties, to "decide in each case" a "unit appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b); *see State Farm Mut. Auto Ins. Co. v. NLRB*, 411 F.2d 356, 361 (7th Cir. 1969) (en banc) ("The Board's determination is not confined to the units suggested by the parties, but it may choose any unit which it reasonably deems appropriate.").

With regard to the solicitation of evidence about an alternate unit, the Act requires the Board to "provide for an appropriate hearing" when representation questions arise. 29 U.S.C. § 159(c)(1). And the Board's regulations require the Hearing Officer to "inquire fully into all matters and issues necessary to obtain a full and complete record." 29 C.F.R. § 102.64(b) (2017). Here, the Company presented extensive evidence at the hearing about the two Alaska-based employees and their relationship with the rest of the Cable Systems Group. In that context, the fact that the Hearing Officer did not expressly solicit evidence about the alternative unit caused no discernible prejudice to the Company. Indeed, despite challenging the Regional Director's decision before the Board and again in this court, the Company "suggests no specific information that it was foreclosed from presenting that contradicts the NLRB's findings." *NLRB v. Lake Cnty. Ass'n for the Retarded, Inc.*, 128 F.3d 1181, 1185 n.2 (7th Cir. 1997).

The Company relatedly suggests that, because it ostensibly received inadequate notice of possible bargaining units, the Board's unit-selection procedures failed to provide an "appropriate hearing" within the meaning of Section 9(c) of the

Act. 29 U.S.C. § 159(c)(1). But the Board held two sets of multiday hearings on the record about the appropriate bargaining unit, and the Board collected extensive evidence from the parties about that determination. It was only after the Company raised the issue of Kelley and Huff's exclusion from the unit that the Board determined they were integral to an appropriate unit. The Board's process was fully consistent with its duty under the Act to "provide for an appropriate hearing upon due notice." *Id.*

2.

The Company next argues that the Board's procedures deprived the Company of due process. "The fundamental requisite of due process of law is the opportunity to be heard" at "a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (internal quotation marks omitted). As noted, Section 9(c) of Act provides for such a hearing. *See* 29 U.S.C. § 159(c)(1). The Company does not dispute that "the parties spent seven days at hearing, generating over 1,300 pages of transcript and submitting dozens of exhibits," and that the "Regional Director also allowed the Parties to file post-hearing briefs." Company Br. 26. Rather, the Company contends that the Board acted unconstitutionally by including Kelley and Huff in the bargaining unit without providing appropriate notice.

"[T]he contours of due process are flexible and vary depending upon the circumstances of a given case." *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991) (citing *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)). "[R]epresentation cases, unlike unfair labor practice cases, are not adversarial in nature but are fact-finding hearings." *Springfield Terrace*, 355 NLRB 937, 940 (2010); *accord NLRB v. ARA Servs., Inc.*, 717 F.2d 57, 64 (3d Cir. 1983) (en banc).

A representation hearing "is designed primarily to enable the Board to fulfill its statutory function with respect to the certification of bargaining representatives." *State Farm Mut. Auto. Ins. Co.*, 411 F.2d at 360. And in that investigatory context, "all persons concerned have the duty to produce all information relevant to the issue." *Id.* at 360–61. In that setting, the Board was not obligated to provide explicit notice to the Company of every possible alternate unit it might consider, especially when the Company itself introduced evidence relating to the alternate unit ultimately chosen by the Board.

Given the non-adversarial nature of the representation hearing, the Company's appeal to cases involving the Board's finding of an unfair labor practice without providing adequate notice is inapposite. This case, for instance, is quite unlike *NLRB v. Blake Constr. Co.*, 663 F.2d 272 (D.C. Cir. 1981), in which we held that the Board violated an employer's due process rights when it found the employer had committed an unfair labor practice that was neither alleged in the complaint nor fully litigated. *See id.* at 280. Here, the Company was not charged with any violation at the time of the hearing. Rather, the hearing was meant to investigate which set of employees constituted an appropriate bargaining unit so that the Board could fulfill its statutory mandate to select an appropriate unit. *See* 29 U.S.C. § 159.

## B.

The Company's other main challenge is to the Board's conclusion that the voting group shares a community of interest with the preexisting Alaska Unit. We hold that the Board's conclusion is supported by substantial evidence.

A self-determination election "permits employees sharing a community of interest with an already represented unit of employees to vote whether they wish to be added to the existing unit." *Rush Univ. Med. Ctr.*, 833 F.3d at 205 (quoting *St. Vincent Charity Med. Ctr.*, 357 NLRB 854, 855 (2011)). Such an election is warranted when (i) the "employees to be added constitute an identifiable, distinct segment" of the unrepresented employees, and (ii) the "employees to be included share a community of interest" with employees in the preexisting unit. *Id.* at 209 (quoting *Warner-Lambert Co.*, 298 NLRB 993, 995 (1990)). The first prong is not in dispute in this case. The sole question is whether, under the second prong, the voting group shares a community of interest with the preexisting unit.

The Board considers a series of factors in examining that question. Specifically, the Board assesses whether the two sets of employees: are organized into a separate department; have distinct job functions and perform distinct work; are functionally integrated; have interchange and frequent contact with each other; have distinct skills and training and distinct terms and conditions of employment; and are separately supervised. *PCC Structurals, Inc.*, 365 NLRB No. 160, 2017 WL 6507219, at *13 (Dec. 15, 2017) (citing *United Operations, Inc.*, 338 NLRB 123, 123 (2002)). And when, as here, the potential unit encompasses employees in different locations, the Board also examines "geographic proximity; centralized control of management and supervision; and bargaining history." *Alamo Rent-A-Car*, 330 NLRB 897, 897 (2000).

We see no basis for setting aside the Board's determination that the factors relating to the employees' organization within the Company weigh in favor of finding the requisite community of interest. As the Board found, including the

voting group within the existing Alaska Unit coheres with the Company's departmental structure. The voting group is coextensive with the Cable Systems Group (aside from supervisors, whom the Board found to be ineligible), which the Company organizes together with the Alaska Unit under the broader Network Development and Engineering department. Thus, as the Regional Director explained, "[a]llowing the Cable Systems Group employees to vote in a self-determination election would not fracture the Alaska Unit. Instead, it would more closely 'complete' the Alaska Unit by integrating the additional statutory employees under the Network Development and Engineering umbrella." Reg'l Dir.'s Decision & Direction of Election at 25, J.A. 429.

Relatedly, because the same managers—Brewer and Tooke—supervise both the voting group and the Alaska Unit, the Board reasonably determined that common supervision also supports finding a community of interest. True, working under Brewer and Tooke are Holmes and Pavlenko, who at least partially oversee only the voting group. But the record demonstrates that Brewer and Tooke, who oversee the Alaska Unit, also engage in some day-to-day supervision of the voting group.

Additionally, the Board permissibly viewed the factors relating to the employees' duties and functional integration to fortify its finding of a community of interest. As the Board determined, there is significant overlap in job duties between the units, as well as some functional integration of the employees. Technicians at the Hillsboro Network Operations Center "have very similar skills and duties and must be proficient in the use of most of the same software as the Network Technicians in Anchorage." *Id.* at 28. And the Cable Operations employees share many of the same responsibilities as the field technicians in the Alaska Unit, including installing,

repairing, and maintaining network equipment. While the Cable Operations employees largely work separately from their counterparts in the Alaska Unit, the network monitoring groups work closely together on the same matters.

Substantial evidence supports the Board's conclusion that the two remaining factors in the ordinary community-of-interest assessment—whether the two units have frequent interchange and contact and whether they share similar terms and conditions of employment—are neutral. With regard to the first of those factors, the two groups regularly worked together on issues relating to troubleshooting and network monitoring. While those contacts typically took place via phone and email rather than in person, the nature of the network monitoring employees' work lends itself to virtual contact instead of face-to-face collaboration.

The record also includes two examples of employees making permanent transfers between the Company's Alaska and Oregon locations. This, then, is not a case like *NLRB v. Tito Contractors, Inc.*, 847 F.3d 724 (D.C. Cir. 2017), in which the Board disregarded the Regional Director's finding that "[t]here [was] no evidence of any interchange between the recycling employees, or between the recycling employees and any other classification of employee." *Id.* at 733 (alterations in original). In fact, the Board here corrected the Regional Director's finding that there was evidence of temporary interchange between the Alaska and Oregon locations, explaining that the record did not support that conclusion. Based on that evidence, the Board permissibly assigned a neutral value to whether the two groups have frequent interchange and contact.

The same is true with regard to the employees' terms and conditions of employment. On the one hand, the employees in

both groups are paid on an hourly basis and earn comparable hourly wages, and are subject to some universal Company policies and benefits. On the other hand, certain benefits—including pensions and health insurance plans—vary between the groups. But differences with respect to terms and conditions of employment "may reasonably be expected" when unrepresented workers seek to join an existing bargaining unit, in which such items are governed by a labor contract. *Dillon Cos., Inc. v. NLRB*, 809 F. App'x 1, 2 (D.C. Cir. 2020) (quoting *Pub. Serv. Co. of Colo.*, 365 NLRB No. 104, 2017 WL 3115256, at *1 n.4 (July 5, 2017)). For that reason, the Board has previously explained that, in self-representation elections, differences in employment terms attributable to one group's union membership should not weigh heavily against finding a community of interest. *See Pub. Serv. Co. of Colo.*, 2017 WL 3115256, at *1 n.4. It may be that the employees seeking to join the union hope to attain precisely the benefits enjoyed by their unionized colleagues.

Because the potential unit comprises employees in different locations, the Board also examined "geographic proximity; centralized control of management and supervision; and bargaining history." *Alamo Rent-A-Car*, 330 NLRB at 897. The Board's conclusions with regard to those factors are supported by the record.

As the Board acknowledged, the lack of geographic proximity between most of the employees in the voting group and those in the Alaska Unit is the lone factor that weighs against finding a community of interest. With the exception of Kelley and Huff, the employees in the voting group are all based in Oregon, while the preexisting unit is based in Alaska. But the Board could permissibly conclude that the unique facts of this case temper the degree to which the distance between the groups militates against finding a community of interest.

Two members of the voting group are stationed in Anchorage alongside many other employees in the Alaska Unit. And the nature of the Company's operations lessens the salience of geographic distance in this case. The Company's work requires it to have employees spread across large distances: it offers telecommunications services throughout the entirety of Alaska, and it maintains cables that run across the Pacific Ocean from Alaska to Oregon. The Alaska Unit thus already included employees in far-flung portions of Alaska, some of which are more difficult to reach from Anchorage than is Hillsboro, Oregon.

With regard to the remaining two considerations—centralized control of management and supervision and bargaining history—the Board permissibly found that the first supports the overall finding of a community of interest while the second factor is neutral. The record amply supports the Board's determination (which the Company does not contest) that the Company exerts centralized control of management and supervision over both groups of employees. And the Board appropriately corrected the Regional Director's determination that the employees' bargaining history favored finding a community of interest. The Board recognized that "there is no bargaining history relevant to the community of interest analysis in the instant self-determination dispute, as the petitioned-for Cable Systems Group employees have never been represented by a labor union." J.A. 440 n.1.

In sum, the Board appropriately considered the full record in concluding that the voting group shares a community of interest with the existing bargaining unit, and the Board took account of evidence that tended to cut against its finding. We thus hold that the Board's ultimate finding of a community of interest is supported by substantial evidence.

18

\* \* \* \* \*

For the foregoing reasons, we deny the petition for review and grant the Board's cross-application for enforcement of its order.

*So ordered.*